**HARTFORD SAND & GRAVEL CO., a corporation, Plaintiff,**

v.

**EAGLE IRON WORKS, a corporation, Defendant.**

**Civ. No. 72–0–406.**

United States District Court, D. Nebraska.

April 27, 1976.

William J. Tighe, Omaha, Neb., Glenn E. McCann, Kansas City, Mo., for plaintiff.

Richard P. Jeffries and Harry L. Welch, Omaha, Neb., for defendant.

DENNEY, District Judge.

This matter comes before the Court for decision subsequent to trial to the Court and the submission of final argument. In accordance with F.R.Civ.P. 52, the Court makes the following findings of fact and conclusions of law regarding liability for the sinking of the dredge in question.

Plaintiff is engaged in the sand and gravel business and has a sandpit in the vicinity of Valley, Nebraska. In 1969, the parties negotiated for the construction of a dredge by the defendant. Both were knowledgeable in the intricacies of dredge construction; however, plaintiff's knowledge came from practical experience, while the defendant had more technical expertise. After several informal discussions, the defendant submitted a detailed, written proposal [Exhibit # 1] which was accepted by the plaintiff on January 28, 1970. The dredge was to consist of a main hull with pontoons, a deck house on the main hull enclosing the various pumps and controls, a 100 foot "swintek ladder" (a tubelike suction device), and various winches. It was delivered to plaintiff's sandpit in May, 1970, and was there assembled under the direction of Mr. Berkley, an engineer for the defendant. Assembly was completed in June, 1970, and the dredge operated without substantial difficulty until the weekend of December 11, 1971, when it sank.

Plaintiff contends that the cause of the sinking was the negligent design of four openings which allowed water to ship into the hull and pontoons. The openings in question were 13″ long by 2″ high, located 13″ above the mean water line. Through them passed hydraulic lines from a pump in the main hull to winches on the pontoons. It should be noted that the pontoons were located very close to the main hull—there being only a ½″ gap, or slot, between them. On December 11, 1971, the dredge was facing northwest and was located 200′ off the shore. The wind was from the northwest; thus, the dredge was headed into the wind, lying 200′ from the windward shore. The "swintek ladder" extended from the main hull of the dredge windward to a point approximately 100′ from the windward shore, and the outer end was immersed. At noon on Saturday, December 11, the dredge was shut down by Mr. Growcock, an inexperienced operator who was the vacation substitute for the regular operator. Although the evidence is conflicting, the wind at the sandpit was approximately 25 knots. Plaintiff's experts assumed that this wind velocity would cause waves 2 to 4 feet high, which would be amplified in the slot between the main hull and pontoon. Defendant's experts showed that waves of only 4″ (trough to crest) would result from a 25 knot wind acting upon a 200′ "fetch" (distance from windward shore). They also demonstrated that waves would be dampened in the slot, not amplified. The Court, after much study, is persuaded by defendant's experts on this point.

The evidence shows that the sinking was proximately caused by a siphoning of water from the jet pump discharge on the distal end of the swintek ladder through the ¾″

drain into the main hull. When the dredge was raised, the ¾″ plug was missing from the jet pump. Probably, the operator removed the plug to avoid any possible damage due to freezing. Apparently, the plaintiff's practice was to drain the pumps as part of the annual winter shut down procedure, but not to drain them prior to a normal weekend shut down. On the weekend in question, the plug was not to be removed. It should be noted that once the jet pump line was filled with water (e. g., as would occur in normal operation) a siphon was created that is impossible to break except by lifting the swintek ladder out of the water. Thus, when the pumps were shut down and the drain plug removed, water started running into the main hull at a rate such that, after about 10 hours, the dredge had sunk to a level where water could pour through the 2″ by 13″ slots, thereby accelerating the sinking. There were no witnesses to the sinking, and the experts disagreed as to its cause. The foregoing description of the sinking was reached after carefully examining the testimony of these experts and the documents in evidence.

■■■ The sinking could have been averted if the swintek ladder were raised out of the water; if the drain plug were not removed from the jet pump; or if there were an automatic bilge pump installed in the dredge. The 2″ by 13″ slots merely accelerated what was already incipient sinking.

Exhibits 116 and 117 demonstrate that defendant recommended that the swintek ladder be raised out of the water as part of normal shutdown procedure. This was recommended to prevent damage to the mouth of the swintek ladder, and is considered good practice in the industry. Plaintiffs, however, followed the practice of lifting the ladder until it was almost out of the water. By not lifting it completely out, the lifting mechanism was put under less stress. There is little evidence indicating how or why the ¾″ plug was removed; however, there is no evidence showing that its removal was caused by any negligence or breach of warranty on the part of the defendant.

Lastly, the evidence relating to the existence of a bilge pump is quite contradictory. After a careful review of the testimony of Mr. Harrison (T.R. 423), Mr. Rogert (T.R. 200 and 218), Mr. Lyons (T.R. 451), Mr. Becker (T.R. 51), Mr. Reineke (T.R. 309) and others, the Court concludes that the dredge was not equipped with an automatic bilge pump on December 11, 1971. It did have a bilge pump that was manually controlled and it was used when the dredge was in operation. The dredge in question was custom built. Both buyer and seller were knowledgeable in the field and the buyer approved the seller's detailed proposal. That proposal called for a "means of pumping the bilge [operating] from the priming ejector with hose and strainer provided," and was the result of considerable discussion and negotiation. These facts persuade the Court that the lack of an automatic bilge pump does not, in this case, constitute either a breach of warranty or negligence.

An Order in accordance with the findings of fact and conclusions of law stated herein is filed contemporaneously herewith.